*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

In re A. GARVINS, Minor.

UNPUBLISHED
November 21, 2023

No. 364757
Genesee Circuit Court
Family Division
LC No. 09-124936-NA

Before: HOOD, P.J., and JANSEN and FEENEY, JJ.

PER CURIAM.

Respondent-father appeals as of right the order of the trial court terminating his parental rights to his minor child, AG, under MCL 712A.19b(3)(c)(*i*) (conditions that led to adjudication continue to exist), (c)(*ii*) (failure to rectify other conditions), and (j) (reasonable likelihood of harm if returned to parent). We affirm.

## I. BACKGROUND

This case concerns the termination of respondent's parental rights to AG. AG was born in mid-July 2019 during the pendency of termination proceedings against her mother, VW, in relation to AG's two half siblings. Petitioner, the Genesee County Department of Health and Human Services (DHHS), petitioned the court in VW's case to assert jurisdiction over AG and terminate VW's parental rights. Respondent was not a named respondent in the petition related to VW because he had not yet established paternity. The trial court adjudicated AG as a court ward and terminated VW's parental rights in late September 2019. The permanency plan for AG was adoption.

At a late January 2020 review hearing, the caseworker, Brittany Welch, stated that although respondent was participating in voluntary services, he still had not established paternity so AG could not be placed with him. The referee at the hearing noted, however, that the trial court entered an order in late December 2019 declaring respondent AG's legal father. The referee therefore ordered AG, who was approximately six months old at the time, to be placed with respondent that day.

In mid-August 2020, DHHS filed a petition for temporary jurisdiction over AG. It alleged that respondent and VW were involved in various domestic-violence incidents. DHHS alleged

that in April 2020, respondent jumped on VW, gave her a black eye, and stole her vehicle. AG was present for this incident. It further alleged that in May 2020, respondent stole another of VW's vehicles and rammed it into another vehicle. DHHS also alleged that in June 2020, respondent and VW got into an argument that led to VW stabbing respondent in self-defense. During this incident, DHHS alleged, a wooden CD holder struck AG. Respondent was arrested after the April 2020 incident and charged as a third-offense habitual offender with assault with intent to commit murder and domestic violence.[1] Despite the acts of violence between respondent and VW, the petition also alleged that respondent had allowed VW to have access to AG, contrary to the order terminating her parental rights.

Following his arrest for the April 2020 incident, respondent initially asked that the court place AG with his ex-fiancée, SS. According to Rickie Miles, a worker for Children's Protective Services (CPS), respondent's engagement to SS ended because of "domestic violence." Nonetheless, respondent claimed AG had formed an attachment to her when respondent, SS, and AG lived together. Though SS stated she was afraid of respondent, at a late August 2020 hearing, respondent indicated that he had not had contact with SS in two months and that he intended to comply with a personal protection order (PPO) that prohibited contact with her.

At a late August 2020 hearing, Miles testified about the domestic-violence incidents between respondent and VW, reporting that respondent was arrested and detained for one of the incidents. Miles testified again at an early September 2020 hearing, describing his investigation of the domestic-violence incidents. He indicated that there was an allegation that AG was hit on the head with a cassette tape during one of the altercations. She received an examination for injuries after the incident and although no head injury was discovered, two puncture-like marks were found on her thigh. The trial court authorized the petition for temporary wardship following the September 2020 hearing.

In October 2020, respondent pleaded no contest to the allegations in the petition and the court exercised jurisdiction over AG. Respondent asked for AG to remain in SS's care while he was incarcerated pending resolution of the assault with intent to commit murder and domestic violence charges arising from the April 2020 incident. DHHS recommended that respondent participate in a psychological evaluation, complete and benefit from parenting classes, and find and maintain appropriate housing and a legal source of income after his release from jail. Respondent was also required to complete anger-management and domestic-violence classes. The court adopted these recommendations for respondent's treatment plan.

At an early April 2021 hearing, Welch (the caseworker) reported that respondent remained incarcerated with his criminal charges still pending. He was receiving counseling from a therapist and recovery coach. In late June 2021, Welch indicated at a permanency planning hearing that respondent remained incarcerated. Respondent, however, stated that his criminal matters were resolved and he would be released soon after the hearing. Respondent indicated that, among other

---

[1] In addition to charges stemming from domestic violence toward VW, DHHS's petition also noted respondent's criminal history, including his conviction for second-degree murder after he killed a friend in a dispute over a debt.

services, he would receive a psychological evaluation and domestic violence classes, and that he would be in a 12-month outpatient program with these services.

In mid-July 2021, respondent pleaded no contest to a charge of assault with intent to do great bodily harm pursuant to a plea agreement, resolving criminal proceedings related to the April 2020 incident. Under the agreement, the court sentenced respondent to five years' probation, with one year to be served in jail. He received credit for time already served (almost one year) and was released from jail in August 2021.

In mid-September 2021, the newly-assigned caseworker, Alyssa Freeman, reported at a review hearing that respondent had contacted VW in violation of a PPO. During this incident, respondent reportedly broke VW's car window. Respondent denied that the incident occurred. The court indicated it would change the permanency plan to a guardianship if it received confirmation that respondent had broken the car-window incident. At a late October 2021 hearing, Freeman reported that the substance abuse treatment facility where the car-incident allegedly occurred did not have information about the reported altercation between VW and respondent. Freeman recommended continuation of the reunification plan and indicated that respondent was complying with services and "doing wonderfully."

In early January 2022, however, Freeman reported that respondent was released from a substance-abuse treatment program and parent-partner program because he was noncompliant and making no progress. Respondent was reportedly scheduled to start parenting classes in mid-January 2022. He indicated he could not complete some services, however, because of pandemic restrictions and his lack of a vehicle but that he was complying with drug screens for his probation. He also denied having contact with VW and that he was terminated from the treatment program. AG's attorney requested changing the permanency plan to adoption, noting that respondent had not completed any services during the reporting period, was terminated from some services for noncompliance, and was involved in an incident at SS's residence in which the police were called. The referee instructed the parties to find a solution to allow respondent to attend services without losing employment. She remarked that there had not been progress and expressed concern about respondent's termination from the parent-partner program. The referee adopted the recommendation to change the permanency plan from reunification to adoption.

Respondent sought judicial review of the referee's decision to change the plan to adoption. Notably, respondent's attorney indicated that there was a question of whether respondent's parent-partner had stopped working with him because of conflict between the two. The court did not alter the referee's decision, though it advised respondent that if he continued working toward reunification, DHHS may refrain from seeking termination of his parental rights. It also ordered continued participation in the parent-partner program.

In mid-March 2022, DHHS filed a supplemental petition to terminate respondent's parental rights. It alleged that respondent had failed to maintain suitable housing, having remained homeless since his release from jail, and had failed to provide documentation of income. DHHS further alleged that although respondent had received mental-health therapy, he failed to complete a psychological evaluation. It also alleged that respondent violated a no-contact order with VW, leading to police incidents in November 2021 and January 2022, and that he had harassed SS by phone and in person, sending threatening text messages and breaking a window at her house a few

days before DHHS filed its termination petition. DHHS also alleged that respondent had failed to demonstrate benefit from his anger-management counseling and the parent-partner program, and that he attended only 53 out of 150 scheduled visits with AG.

At an early April 2022 pretrial hearing, Freeman reported that respondent became angry during video visits because AG—two years old at the time—would not sit still. She also reported that respondent broke a window at SS's home and sent her threatening text messages, including one indicating "she would end up in Gracelawn" Cemetery if she did not return AG. At some point, according to Freeman, SS left her home and moved to a relative's home to avoid respondent. Respondent found her, however, and harassed her at the relative's home. A few weeks later, at a late April 2022 pretrial hearing, Freeman testified that respondent did not complete or benefit from anger-management treatment, nor did he complete parenting classes or substance-abuse counseling. Freeman reiterated respondent's threatening message to SS to "be prepared to be at Gracelawn Cemetery." Freeman also could not verify whether respondent had appropriate housing, nor confirm his employment. She also stated that respondent's therapist indicated that respondent never discussed his conflicts with her, and that she was surprised to learn he did not benefit from his anger-management program.

At a continued hearing in mid-May 2022, Freeman testified that although respondent completed anger-management classes, his therapist recommended he retake them because he showed no benefit from them. Freeman also indicated that respondent did not complete substance abuse treatment and failed to comply with drug screen, that he and VW accused one another of assault, and again discussed respondent's threat to send SS to a cemetery and the window he broke at her home.

The trial court held a two-day termination hearing in September 2022 and December 2022. Freeman testified extensively about the domestic-violence incidents between respondent and VW, and those between respondent and SS. She also discussed respondent's participation in services, indicating that although he made progress throughout 2021, that stalled in December 2021. Freeman noted that although respondent completed an anger-management course, his therapist recommended more sessions because respondent did not show any progress. Freeman did not believe respondent benefited from anger management.

Freeman also testified about respondent's participation in the parent-partner program. She noted that he was hostile with his worker, Sonya Jackson, and that he refused to enroll in parenting classes she found for him. Freeman believed that respondent did not benefit from the parent-partner program. She also noted that respondent had a pattern of beginning programs but not completing them, including for substance abuse, or not attending services consistently. Freeman testified further that DHHS did not require respondent to comply with drug screening, noting it was required as part of his probation, though his probation officer could not confirm whether respondent cooperated. She also testified, consistent with the petition, that respondent attended 53 out of 150 scheduled visits with AG, indicating that he missed visits because of his work schedule or because he failed to setup appointments. Freeman also believed that respondent was homeless, explaining that he stayed in homeless shelters, hotels, and with other individuals, and never allowed her to see his housing or showed her a lease.

Freeman testified that respondent failed to resolve the conditions that led to AG's adjudication. She believed that AG would be at a risk of harm in respondent's care because he could not manage his anger. According to Freeman, respondent's inability to control his anger was the primary barrier to reunification. She thought that respondent had "so much potential" but let his anger "get the best of him sometimes." Though he never showed aggression toward AG, he was violent toward women in his life, including engaging in acts of violence when AG was present. Freeman also noted that respondent had sent threatening text messages to SS about returning AG to him, that he was charged with stalking and malicious destruction of property for breaking a window at SS's home, and that SS moved because she felt unsafe. Freeman also opined that termination was in AG's best interests. She testified that AG "showed escalated behaviors" when with respondent and expressed her belief that respondent's behavior would be detrimental to AG's physical, mental, and educational development.

Respondent testified at the termination hearing. Much of his testimony focused on his involvement in various violent incidents and his criminal history. He admitted to two violent incidents with VW in 2020 that resulted in him pleading no contest to felonious assault, assault with intent to do great bodily harm, and domestic violence. Respondent admitted that AG was present for the first incident with VW, but he did not believe she was present for the second incident. He also confirmed that he had then-pending charges of malicious destruction of property and aggravated stalking arising from the March 2022 incident with SS. Though respondent did not believe AG was present for this incident, he acknowledged that AG was living with SS when he confronted SS at her home in March 2022.

Respondent denied being homeless. He testified that he provided his caseworker with proof of income, his tax return, and a lease, and indicated that he was told that home visits were not possible because of COVID restrictions. Respondent blamed agency staff for some of his missed visits. He also testified that while incarcerated he participated in substance abuse counseling, parenting classes, and anger management. According to respondent, however, Freeman informed him that the services he completed during his incarceration did not count toward his treatment plan in this case. He instead had to start each program over after his release.

Respondent's therapist Lakisha Atkins-Lewis testified that she began providing therapy to respondent in October 2021. She indicated that he attended therapy consistently, except during his incarceration. Atkins-Lewis confirmed that respondent was cooperative and open during their sessions, and that he never threatened her. She believed he showed accountability for his actions, discussed aspects of himself he wanted to change, and demonstrated growth. Atkins-Lewis indicated that respondent's therapy focused on mental health and anger management. They also discussed domestic violence, though not in depth. Atkins-Lewis also admitted that she knew of respondent's convictions for violent offenses, but was surprised that respondent did not inform her of the window-breaking incident at SS's home. She was not, however, surprised that incident occurred. She testified that respondent had strong emotions about his fear of losing AG.

SS testified at the termination hearing about her relationship with respondent and her care for AG. She indicated that she had an on-and-off relationship with respondent and tried to maintain a friendship with respondent between breakups so AG could have him in her life. She ended the relationship, however, because of escalating problems with respondent and VW, and after respondent falsely reported SS's son to CPS. SS also testified about the March 2022 incident with

respondent, indicating he beat on the door of her home, shattered her bedroom window, and rammed his vehicle into a vehicle parked in her driveway. She obtained a PPO against respondent after this incident. SS testified that respondent could not control his anger, even with the prospect of returning AG to his care. She opined that respondent was not currently able to take of AG and stated that she loved and would adopt AG "in a heartbeat" if approved by the court. SS wanted to adopt AG because she had cared for AG since AG was "two weeks old" and SS was the only consistent presence in AG's life. She believed that termination of respondent's parental rights was in AG's best interests because respondent could not cooperate with SS to help raise AG.

Jacqueline Gallant, a counselor with Flint Odyssey House, a program that provided family therapy and recovery coaching, testified that she was respondent's substance use disorder counselor. She indicated that respondent participated in a parenting group and was expecting to obtain his parenting certificate the week after the December 2022 termination hearing. Gallant testified that recovery coaches reported respondent was engaged and committed to the program, and indicated that he demonstrated progress because he called the workers when he needed help facing difficulties. Respondent was working with one of his recovery coaches to obtain employment and housing. She believed respondent was doing what he could to change his future and abandon his past ways. Gallant also knew that respondent had received other services in the past two years but believed he did not have enough support in those previous programs.

Tyyona Copeland, respondent's foster care worker at the time of the December 2022 termination hearing, testified about respondent's stability and effects on AG. She testified that she started working with respondent in late November 2022, though she previously served as respondent's "monitor." According to Copeland, she reviewed case notes related to this case and indicated that between early September and late November 2022, respondent had attended 11 parenting time sessions and missed 5. She also noted that respondent did not provide documentation of stable housing or employment. Copeland believed termination was in AG's best interests because respondent failed to attain stability. She testified that SS provided good care to AG, noting that AG was up to date with her medical and dental care, and that the two were bonded. Copeland opined that although respondent had participated in services, he failed to demonstrate that he benefited from them. She also acknowledged that although Gallant and Atkins-Lewis reported favorably on respondent's progress, they never observed him with AG and had only started those services recently. Copeland acknowledged that AG had a bond with respondent and recognized him as her father. But AG sometimes became upset during parenting time and asked to go home. According to Copeland, respondent reacted by yelling at AG, causing her to cry. Copeland thus testified that although "they do have a bond," she could see respondent's anger "sometimes during visits when [AG's] behaving like a regular child." Copeland agreed that because respondent did not have stable housing or employment, the court could not return AG to respondent's care and, regardless, giving respondent more time would be "scarring" for AG.

In mid-January 2023, the trial court issued a written opinion and order terminating respondent's parental rights under MCL 712A.19b(3)(c)(*i*), (c)(*ii*), and (j). The court found that respondent had failed to benefit from services offered. It noted that there was no documentation that he completed a psychological evaluation or maintained suitable housing or a legal source of income, and found that he had attended only 53 out of 150 scheduled visits. The trial court also noted that respondent repeatedly violated a court order to have no contact with VW. It further found that respondent continued to struggle with anger management, finding that he persisted in

harassing SS,[2] was unable to control his anger despite years of anger-management treatment. Though the trial court cited all three statutory grounds as supporting termination, its analysis focused on MCL 712A.19b(3)(j). It found that respondent had failed to comply with the terms of his treatment plan, made minimal progress on other terms, and had continued anger-management issues. The court also noted that respondent's behavior could have "life-long and profound effects" on AG. The trial court determined that termination was in AG's best interests, concluding that AG, "as a nearly-3-1/2-year-old girl," needed stability, permanency, and finality. It noted that there was a possibility, if not a high likelihood, that SS would adopt AG. The court therefore terminated respondent's parental rights. This appeal followed.

## II. STANDARD OF REVIEW

"If the court finds that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of parental rights and order that additional efforts for reunification of the child with the parent not be made." MCL 712A.19b(5). We review for clear error the trial court's decision that statutory grounds for termination have been proven by clear and convincing evidence, as well as its determination that termination is in a child's best interests. *In re Olive/Metts Minors*, 297 Mich App 35, 40; 823 NW2d 144 (2012). "A trial court's decision is clearly erroneous if although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made." *Id*. "Best interests are determined on the basis of the preponderance of the evidence." *In re Keillor*, 325 Mich App 80, 93; 923 NW2d 617 (2018) (quotation marks and citation omitted). "This Court gives deference to a trial court's special opportunity to judge the weight of the evidence and the credibility of the witnesses who appear before it." *In re TK*, 306 Mich App 698, 710; 859 NW2d 208 (2014).

## III. STATUTORY GROUNDS

Respondent argues that the trial court clearly erred by finding that clear and convincing evidence supported termination of his parental rights under MCL 712A.19(3)(c)(*i*), (c)(*ii*), and (j). We disagree.

Though the trial court terminated respondent's parental rights under MCL 712A.19b(3)(c)(*i*), (c)(*ii*), and (j), the court provided specific analysis of subsection (j). We therefore focus our review on MCL 712A.19b(3)(j). A court may terminate parental rights under MCL 712A.19b(3)(j) if it finds clear and convincing evidence that "[t]here is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent." "The harm contemplated under MCL 712A.19b(3)(j) includes emotional harm as well as physical harm." *In re Sanborn*, 337 Mich App 252, 279; 976 NW2d 44 (2021). "[A] parent's failure to comply with the terms and conditions of his or her service plan is evidence that the child will be harmed if returned to the parent's home."

---

[2] The trial court wrote that respondent "continually harassed and threatened (verbally and otherwise) [VW] and her son ([MW])." This was an error. The individual referenced by the trial court as VW's son was actually SS's son.

*In re White*, 303 Mich App 701, 711; 846 NW2d 61 (2014). Failure to benefit from services may also be considered as evidence that the child may be harmed if returned to the parent's care. *In re Sanborn*, 337 Mich App at 279-280. DHHS need only establish one statutory ground to support an order terminating parental rights. *In re Ellis*, 294 Mich App 30, 32; 817 NW2d 111 (2011).

The trial court did not clearly err when it found clear and convincing evidence supporting termination under MCL 712A.19b(3)(j). The evidence supported a finding that respondent failed to rectify his anger-management and domestic-violence issues. The child was removed from respondent's care because he twice assaulted VW. AG was present for at least one of these incidents and when respondent contacted VW, he did so in violation of a no-contact order. Respondent's history of violence dates back 30 years, extending from his conviction for second-degree murder to acts of violence that occurred after the court took jurisdiction over AG. After this case began, respondent failed to adequately address and resolve his propensity for physical violence. Despite participating in anger-management counseling, he continued to threaten and intimidate SS, the caretaker of his child. In March 2022, he went to SS's home "in a rage," pounded on the door, broke a window, and deliberately crashed his vehicle into a vehicle in the driveway. Critically, respondent minimized and denied how these actions could be harmful to AG. He denied that AG was in the home during the March 2022 confrontation, though he conceded that AG resided there with SS and it was unlikely that the three-year-old child was not at home with her caregiver. Respondent insisted that his actions toward his ex-fiancée would not affect the child, even after SS moved away because respondent made her feel unsafe in her home. He minimized his past violent acts, testified that he was innocent, blamed VW for their violent altercations, and attributed his harassment of SS to his "passion" for his child's well-being. He also minimized the seriousness of his conduct that caused the death of a friend by saying he "tried to scare him" but "w[ound] up shooting him."

The trial court also did not clearly err by finding that respondent did not benefit from services. Respondent's continued aggression, despite anger-management counseling, indicated that he did not benefit from that service. Though Atkins-Lewis and Gallant provided testimony favorable to respondent, neither observed him with AG. According to Copeland, respondent often yelled at AG during visits when she sought to leave the visits, causing her to cry. Although respondent and AG had a bond, Copeland could see respondent's anger "sometimes during visits when she's behaving like a regular child." The court was also justified in giving more weight to the evidence of respondent's actual continued threats and acts of violence toward SS. Clear and convincing evidence established that respondent failed to resolve his propensity for violence that led to the child's adjudication. Despite anger-management counseling, respondent continued his threatening conduct toward SS. This included his involvement in the confrontation at SS's home in March 2022 when he pounded on the home of her door, broke her bedroom window, and ran his vehicle into a vehicle parked in her driveway. The evidence therefore demonstrated that respondent failed to benefit from the services provided to him and that there was a reasonable likelihood AG would be harmed if returned to his care. See *Sanborn*, 337 Mich App at 279-280.

Accordingly, the trial court did not clearly err by finding that termination was proper under MCL 712A.19b(3)(j).[3]

## IV. BEST INTERESTS

Respondent also argues that the trial court erred by finding that termination of his parental rights was in the child's best interests. We disagree.

In termination proceedings, the trial court must weigh all the evidence within the entire record to determine the children's best interests. See *In re Trejo*, 462 Mich 341, 356-357; 612 NW2d 407 (2000); *In re White*, 303 Mich App at 713. "The focus at the best-interest stage has always been on the child, not the parent." *In re Payne/Pumphrey/Fortson Minors*, 311 Mich App 49, 63; 874 NW2d 205 (2015) (quotation marks, citation, and brackets omitted).

"To determine whether termination of parental rights is in a child's best interests, the court should consider a wide variety of factors that may include the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *In re White*, 303 Mich App at 713 (quotation marks omitted). "The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption." *Id*. at 714.

The trial court did not clearly err by finding that it was in AG's best interests to terminate respondent's parental rights. The evidence demonstrated that respondent failed to resolve his propensity for violence. He also failed to acknowledge how his violence against other persons, including AG's caregiver, SS, could adversely affect AG. He not only minimized the effect of his actions by explaining that AG was in a different room when he assaulted VW, and that he believed that AG was not home the night he violently confronted SS at her home in March 2022, but he also blamed VW and SS for triggering his rage. Respondent also attended only 53 of 150 scheduled visits with AG. And although he never physically abused AG and Copeland believed the two had a bond, respondent yelled at AG during supervised visits when he was frustrated by her age-typical behavior, causing her to cry. Conversely, AG had resided with SS most of her life. The evidence showed that SS was meeting all of the child's needs, provided AG with security and stability, and that the two shared a bond. SS also expressed a desire to adopt AG, and the court found there was a high likelihood of adoption. The evidence therefore supported the trial court's finding that it was in AG's best interests to terminate respondent's parental rights.

We affirm.

/s/ Noah P. Hood
/s/ Kathleen Jansen
/s/ Kathleen A. Feeney

---

[3] Though we need not address the other statutory grounds because only one ground need be established, *In re Ellis*, 294 Mich App at 32, we conclude that our analysis and the evidence presented also supported termination under MCL 712A.19b(3)(c)(*i*).